We'll move to the second case of the day, number 182529 Venckiene v. United States. And we'll hear from Mr. Spevak in just a moment. Court, please. Go ahead. Good morning, Your Honor. It's counsel Barry Spevak and Michael Monaco on behalf of the Avalon Neringa Venckiene. In our view, the defendant led a rebellion against the Lithuanian government fueled by sexual allegations of sexual molestation committed against her young niece by people in power who either perpetrated the molestation or allowed this kind of conduct to propagate. The appeal asks this court to reverse the decision of the district court declining to stay its order of extradition. Now, we understand that our principal argument based on the so-called political offense exception to extradition is controlled basically by this court's opinion in Ian v. Wilkes. And that court held that the first element of the exception is the existence of a violent political disturbance. If we stop there, it seems we clearly fit within that category. The offenses were committed during a political disturbance that included violence, and it would appear that this falls clearly under that principle in Ian v. Wilkes. But we understand that Ian v. Wilkes then went further to define what a violent political disturbance is and added that it would be something such as war, revolution, or rebellion. And we understand that this has traditionally been preserved for periods of intense bloodshed or an accumulation of violent incidents over a long period of time. And obviously, that is not particularly the situation here. But that is likely because the Lithuanian government suppressed the rebellion as it was just getting started. It cut off the head of the insurrection when it sought to arrest Ms. Venskiany and cause her to flee to the United States. While Ms. Venskiany's interest was in safeguarding her young niece from sexual predators, and that's what triggered her involvement in the movement, the overall objective was to expose government corruption. And it did so in a manner that led to some members to threaten violence. It did lead to some violence, and it did lead to some deaths. Ms. Venskiany's supporters viewed themselves as a resistance group opposing the government. They targeted people in government they believed were child sexual predators and conducted surveillance on them and sought out information that could be used against them. Their supporters called for violent political acts such as blowing up Parliament. Importantly, the resistance movement targeted not the citizenry, but the government itself. And the government took the fight back to Ms. Venskiany and her supporters. Mr. Spivak, can you direct us to any American court precedents treating a country as apparently peaceful from the outside as Lithuania seems to be, as undergoing this kind of violent rebellion, civil war or revolution? I don't think I could. The only one I could think of is there was an extradition with Canada. A Native American group that was doing some protests. That was a district court decision out west, right? Right. I can't come up with the name of it, but I know what you're talking about. But most of the cases seem to involve much more clear-cut cases of rebellion or war. No question about it, Judge. Most of the cases, when we think of political rebellion, we're thinking of, say, the Irish Republican Army in Ireland, at least. Or we're thinking about the Sikh uprising in the Middle East, that sort of thing. And this was a resistance group that obviously did not have those particular aspects to it. But one thing that has always troubled me about the way we look at the political offense exception, and political offense has undergone changes through the years, whether we're talking about dispersed parties, being part of a political movement, what is included in that. It seems to me that the definition almost says that if I was a lawyer back in Lithuania at the time, and Ms. Venskyene came to me and said, we just did this, what should we do? Will I go to the United States and will I be able to seek extradition? Should I, with a wink and a nod, say, well, you might want to conduct maybe another bombing or two over the next month or so? Because that's going to be the only way you're going to be able to fight extradition from the United States. So I think the rules need some retooling. And I think they should cover a situation here, a situation where we do have people calling for, in fact, a violent political uprising, talking about blowing up the government. There's a tremendous amount of that discussion going on in the United States right now. Yes, there is. And a tremendous amount of discussion that probably may end up changing things like extradition and those sort of laws right now. You may or may not. Well, I think part of the problem with this case, and we're talking about the state, is there are a lot of unanswered issues yet that seem to need more exploration. Such as, and as I was listening to the other argument, the intersection between asylum and extradition and how they intersect with one another. These are all issues that I think still should be explored by the district court. And it's another reason why a state should be entered in this case at this time. I think, you know, it's our view that the political offense exception should apply to a case like this, where the offenses were definitely political. And where, or they arose out of a political offense. And just a question of whether that is enough to bring someone within the political offense. Almost anything that happens in the field of government is a result of a political offense. Well, but in this case, Judge, we're talking about something that happened where there was an invasion by the Lithuanian government at the home of Ms. Venskiany. To serve a court order to transfer child custody. There was a court order to transfer child custody. There were a couple of failed attempts to do it. And this particular attempt, because, and I'm saying that there was a resistance group, which would seem to be, fall into the fact that there is a political aspect going on to this. There is, in fact, a group of people that are resisting. And they are trying to prevent the government from taking the child. So, it just occurred to me, Mr. Spivak, about 20 years ago I was dealing with some tax protesters in southern Indiana as a district judge. People who don't respect the authority of the United States government. And there were some warrants served and so on. But genuine concern on the marshal's part that folks might have some guns. You can imagine, we've heard about other sorts of standoffs between groups that don't recognize federal authority in the United States. And federal agents here. Turn the situation around. Those groups get into an armed standoff. Maybe some shots are fired, but nobody gets hurt. And one of them makes his way to Lithuania. He objects to extradition and says it was a political offense. The difference, I think, Judge, and I can't give you a definitive answer on that, but I understand your question. The difference in that is a question that I think was brought up a little bit in, it might have been brought up in Ian. Anarchists. With people that are anarchists, because that's what I would describe the people you're describing. They're not looking to change the structure of the government or make it different. They're actually just completely opposed to the government and want to have the government destroyed. Just as the people's liberation organization. So the question would depend upon an analysis of their ideology? I think it does, to some extent, have to do with ideology. That gets to, I guess, my more fundamental problem with this, Mr. Spivak. And that is, in this category of so-called relative political offenses, where the argument is made that something other than treason or the explicitly political offenses is part of a larger political uprising. Why should the courts be deciding that question at all? Particularly when you're talking about a friendly ally, member of NATO, part of the EU. The foreign policy implications are evident. And why shouldn't those be sorted out by the executive branch? Your Honor, it has just been the tradition that whether something is a political uprising or a rebellion is something that a court can decide. Can you be a little more specific than tradition? Because I know it has happened on occasion. The government has also resisted that over the decades in the case law. But I'm asking you, in a case of, let's say, a genuine political uprising and rebellion with a friendly ally, do we want the courts granting safe haven in the United States based on our foreign policy and political judgments? Your Honor, I think that's a concern that it doesn't really exist. I think the court is limited to what it can decide as to whether something qualifies as a political offense. And I don't think it does matter whether it is a friendly ally or not a friendly ally. In today's world, it seems to be reversed anyway. That's a different set of problems. But let me give you some examples just from at least 20th century forward of folks facing criminal prosecutions in their home countries if they had made their way to the United States. Mahatma Gandhi, Adolf Hitler, FARC rebels from Colombia, Shining Path rebels from Peru, Ukrainian rebels against the Ukrainian government now. If they wind up in the United States, are they entitled to say, well, what we're charged with were political offenses and we're entitled to stay here in the United States? Actually, I think that that points out the problem with the way the political offense exception is right now, that there's more likely, under the way the law has been interpreted, to giving those people protection than people that are not committing those sort of atrocities. That's the irony of it. The irony is that those people are more likely to get protection than someone like, say, Vinsciani. Judge Vinsciani obviously doesn't fit into that sort of category, and I don't mean to suggest otherwise. I know. But your theory about the role of courts in deciding political offense questions certainly seems to lead in that direction. The courts are entitled to decide whether something is a political offense, and I can only rely on traditionally that is what's been the purview of the court. I would wish in a case like this that the courts could decide political motivation, political motivation with respect to Ms. Vinsciani would be even stronger, but the courts are not entitled to look at that. They are entitled to look at what qualifies as a political offense. It's up to the Secretary of State to look to see something, whether there's political motivation. Well, under your rebuttal time, you know. I have one question before you sit down. Thank you, Justice. I have the same problem with your named party that I did with the others. You know, you have the United States that should be the custodian. Can you two? You know, Judge, what I think happened is the opinion by Judge Kendall used that as the caption. Okay. So we followed the caption that was used by Judge Kendall in the case that we appealed. Okay. Thank you, Your Honor. Okay. Thank you, Mr. Spivak. For the government. May it please the Court. My name is Jonathan Clough, and I represent the United States. The District Court did not use its discretion when it denied Petitioner's motion to stay her extradition to Lithuania. As the District Court correctly found, Petitioner has failed to make a strong showing that she is likely to succeed on the merits of the claims raised in her habeas petition, challenging the magistrate judge's certification order and challenging the Secretary of State's decision to extradite her. I'd like to turn first to what is Petitioner's primary argument, that's the political offense doctrine. Now, Petitioner's crimes are not political offenses, and they're not political offenses because there simply was no violent political uprising in Lithuania at the time of these offenses. Courts have consistently, for decades, required a significant level of violence to qualify as a violent political uprising. It is correct that this Court in Eton described it as something akin to war, rebellion, or revolution, but this Court is not the only one to have required that level of violence. As the government cites in its brief, and the District Court relied on the Ninth Circuit case in Vaux, which described it as some short period of intense bloodshed, and an accumulation of violent incidents over a long period of time, were required to find such an uprising. A political disturbance that involved violence, as counsel described it, is simply not enough for the political offense doctrine. It's not enough to qualify as an uprising. Some sort of violence combined with some sort of political activity is not enough, has never been enough under the case law. It's clear that the violence cited by Petitioner is simply not enough to meet this burden. In sum, she cites a total of four deaths and a handful of violent incidents spread out over a period of multiple years. Petitioner can't cite any cases that would say that this level of violence, this small level of violence, is enough to meet the standard of a violent political uprising. And I think it's instructive to compare the level of violence here to cases where there has been a violent political uprising found. Counsel mentioned a few IRA bombings in Northern Ireland and the UK in the 70s and 80s, the Bosnian Civil War. These are large societal widespread conflicts between a people and a government during which there was a great abundance of violence. The political offense doctrine is intended to be an exception to extradition. It's intended to protect only particular forms of political activity. It's intended to protect only efforts to alter or abolish the government. When that occurs in the course of a widespread societal conflict with the government, requiring a significant level of violence properly limits the political offense doctrine to its intended scope. And a lesser showing would allow any politically motivated violence to prevent extradition. So the political offense doctrine is often talked about as if it's common law. But here we've actually got specific provisions in the treaty, right? That's correct, Your Honor. And Article 4, as I understand it, recognizes the political offense category in general and then has a number of specific exceptions to that exception. Some of the most serious kinds of violent crimes that have caused this kind of litigation in the United States and made some of these cases so troubling, like murder, kidnappings, bombings, and so on. First, is that common in modern extradition treaties? I'm not sure I can speak to that, Your Honor. I'm not aware. Okay. And second, which way does that list of exceptions cut when the crimes that this person is charged with in Lithuania are a long way from that list? We're certainly not saying that the petitioner's crimes fall under that list, Your Honor, but I don't think it affects the question. The question at the end of the day is, under the political offense doctrine, whether there was a violent political uprising that her offenses were incidental to. So I think by the terms of the treaty, her offenses are simply not covered because it requires a political offense and the case law interprets a political offense to require a significant level of violence. I'm going to ask you on this question about the respective roles of courts in the executive branch on the political offense exceptions to extradition. In the Ninth Circuit decision of Quinn, going back to about 30 years ago, the courts suggested that the courts might be doing the executive a favor by denying extradition that the executive was seeking but wouldn't really have its heart in. I was wondering if you had any views on that question, on that theory for why the courts should step in. I don't think your question is right to question which branch of government is best equipped to determine these questions. I can't really speak to whether the executive branch were considered a favor from the judiciary if they were to rule on particular questions. I'm sorry, Your Honor. I can't do them any favors anyway. Counsel, speaking of the relative role of the executive and the judiciary, I have a question about the humanitarian exception of the atrocious punishment language in BERT, which you say there is reason to question whether that remains vital. I take it that you're not questioning the part of BERT that says equal protection claims and due process claims should be cognizable, just the atrocious punishment. We're not going that far, Your Honor. I think I would just emphasize that the matter of BERT stands for the proposition that there might be some exceptions to the general rule that the Secretary of State is entitled to discretion here in deciding whether to extradite, and that's the case even when there are constitutional claims raised by the international fugitive. The Supreme Court in Munafi-Garren, I think, reinforces that point. So there's reasons to question BERT's continued validity, but even if it still exists, it's clearly reserved for extremely exceptional cases. It's reserved for exceptional cases even by its very language, but the fact that I'm not aware of any cases that have ever relied on a humanitarian exception to pierce the Secretary of State's discretion, I don't believe the petitioner cited any either, I think speaks to the fact that it's clearly reserved for exceptional cases, and this simply isn't one of them. And I don't believe that anything the petitioner's offered gives this court reason to be the first court to apply this exception. Can I ask you, we've got a situation here, Mr. Clow, where the district judge found probable cause had been shown as to only two of the four crimes that were charged that were the subject of the extradition request. Technically four, Your Honor, but two felonies, yes, you're right. Okay, I may not have them exactly straight, but would the doctrine of specialty, either in general or under this treaty, if the petitioner is in fact extradited to Lithuania, would that doctrine or treaty provision prohibit Lithuania from prosecuting her on the other two offenses? That's correct, Your Honor, and I believe that it's actually a part of this extradition treaty. It's Article 16, which is at page 16 of EXR 1-1, does include the rule of specialty, and that rule states that she can only be prosecuted for crimes for which extradition was certified, and in this case that would be limited to the four offenses that I just mentioned. It's also clear in the case law, and the petitioner acknowledges it, that Lithuania's motivations or petitioner's allegations about the motivations of Lithuania to seek her extradition are not relevant to the political offense doctrine, and in fact they're not subject to judicial review. That issue is reserved to the Secretary of State to determine the validity of those claims and to determine whether to extradite or not based on those concerns, and the rule comes from the fact that the Secretary of State, as courts have acknowledged, is simply better equipped to determine these issues. The Secretary of State has the subject matter expertise to know what's going on in Lithuania. They have the resources to determine that. They have the diplomatic relations with the nation of Lithuania to actually mitigate any of those risks or try and ensure that they do not occur, and so it is not the case. I don't want to suggest that petitioner's allegations about Lithuania's motivations or any treatment that she alleges she will receive when she returns to Lithuania is not relevant to extradition. This is just not the forum to hear those concerns, and courts, including this one, have confirmed that ruling over time. I'd like to touch briefly on the petitioner's probable cause argument. Petitioners failed to show that there's no evidence to support the magistrate judge's finding of probable cause. The record before the magistrate judge contained statements from multiple witnesses to petitioner's crimes, namely the fact that she refused to comply with these court orders transferring custody of her niece and assaulted a police officer during the eventual transfer of the child. The magistrate judge was entitled to rely on these statements that were contained in the extradition request, and petitioner's allegations merely contradict the record and are not admissible in an extradition hearing, and the magistrate judge properly refused to consider them. Nothing petitioner offers does anything to obliterate this probable cause finding, and for that reason, her probable cause argument fails. Can you explain the difference between explanatory evidence and contradictory evidence? I can try, Your Honor. I think it's easier to define what contradictory evidence is, and it's any evidence. It's clear what can count as contradictory evidence. It's anything that would go to the weight of the evidence as opposed to its admissibility. Anything that would require the magistrate judge in this instance to be weighing the evidence to become a fact finder, to be deciding credibility issues, that is contradictory evidence. And it follows from the very purpose of the extradition hearings in the United States, which is a very limited purpose of determining whether there is sufficient evidence to establish probable cause. It follows from that that the magistrate judge is not supposed to be in the position of deciding facts. How about evidence of self-defense, for example? Your Honor, the law is clear also that legal defenses such as that are also not at issue at an extradition hearing. Those issues are best reserved, as courts have recognized, for the trial courts in Lithuania in this instance. Again, it is not to say that any of these issues that petitioner raises challenging probable cause, it's not that they're not relevant. This is just not the forum for them. The forum for them is in Lithuania, where she awaits trial. And finally, I touched on this briefly, but I'd like to turn to petitioner's challenges to the Secretary of State's decision. The Secretary of State, as Your Honor recognized in the opposing counsel's argument, the general rule is that the decision of whether to extradite is left to the broad discretion of the Secretary of State. Petitioner can't cite any cases that show that there are any due process limitations on that. In fact, every court has found that the Secretary of State's broad discretion comports with due process. The cases cited by the government and relied upon by the district court, Peroff and Escobedo, rejected due process limitations, rejected requiring some sort of guidelines for how the Secretary of State could exercise its discretion, and it relied on the fact, as I said before, that the Secretary of State is the one entrusted with making these extradition decisions. They're in the best position to actually determine these issues and decide whether or not to extradite. And because extradition implicates international relations and foreign affairs, due process does not require any sort of hearing before the Secretary of State or any more detailed basis than was given for the Secretary's decision here. I do need to push back on the notion that there was no explanation given to Petitioner for the Secretary of State's decision. And Your Honors can look at the Secretary of State's letter itself. It's Record 1-2, which explains that the Secretary of State made its extradition decision after considering all the submissions provided by Petitioner. And Petitioner took advantage of her opportunity to provide any material that she believed relevant to the Secretary of State's decision. The Secretary of State has represented that the Department of State has reviewed that information and considered it in making its decision. To conclude, I want to address the suggestion that we are, I think as Petitioner's brief refers to it, at a pleading stage. There is simply no reason to believe that any additional briefing or another hearing will sway the District Court's assessment of the merits on this issue. The District Court gave Petitioner every opportunity to file briefs, to make argument on her motion for a stay, which necessarily touched on the merits of her underlying habeas petition. And the District Court, after considering all those filings, issued a 35-page order going through the basis for the arguments, going through the basis for denying the arguments. It is not that Petitioner's claims fail because the District Court hasn't had time to consider the merits of her habeas petition, but rather because none of Petitioner's arguments are enough to meet her burden to show a strong likelihood of success. And for those reasons and the reasons we outline in our brief, I ask you to affirm the District Court's decision. Thank you very much, Mr. Clough. Rebuttal, Mr. Spivak. Just a couple of things, Your Honor. With respect to Mr. Clough's last remark, with respect to evidence that wasn't presented this time around and what Judge Kendall rejected, was we presented a lot of evidence with respect to the fact of the atrocious procedures in Lithuania that fall under In Re Burt. And Judge Kendall really rejected any arguments we had on that because we were talking about different kind of accounts, whether it was cases or newspaper accounts. We haven't had the opportunity to call witnesses that would be able to support some of the things that were said when we were just trying to get... when just the state was at issue and we were just at the pleading stage. So we didn't have the opportunity to present this kind of evidence. I would note that with respect to whether the exceptions talked about in In Re Burt have ever been applied before, well, if that's true, there has to be a first time and this would be the first time to do it. It still exists with In Re Burt. I think there is some... It's unclear to the extent that In Re Burt and the Musev case intersect, but I do note in the concurring opinion by Justice Souter, he did seem to indicate that there is still room for the courts to determine whether the Secretary of State has allowed some citizen of the United States, in that example, to be sent to his death in a foreign country. So I think that is still also an open question. I would also, if the Court permit me, to remind the Court that... to let the Court know that we did raise the issue with respect to the pending bills in Congress by Congressman Smith and Holcren that would end the extradition and allow... May I finish, Your Honor? Go ahead. That would terminate the extradition proceedings. That, the last I heard, was that that was sent to a subcommittee on July 30th and that's the status of it right now. Thank you. Thank you, Mr. Spivak. Thanks to both counsel. The case will be taken under advisement.